C
Porter v. Cabral
D.Mass.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
Sheila PORTER, Plaintiff,
v.
Andrea CABRAL, Suffolk County Sheriff's Department, Suffolk County, Defendants.
**Civil Action No. 04-11935-DPW.**

Feb. 21, 2007.

Joseph F. Savage, Jr., Goodwin Procter, LLP, David S. Schumacher, Gadsby Hannah, LLP., Boston, MA, for Plaintiff.
James M. Davin, Paige A. Scott Reed, Walter B. Prince, Prince, Lobel, Glovsky & Tye LLP, Ellen Caulo, James M. Davin, Alexandra B. Harvey, Jennifer A. Norton, Adler, Cohen, Harvey, Wakeman & Guekguezian LLP, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, United States District Judge.

*1 On June 10, 2003, Sheriff Andrea Cabral barred Sheila Porter, a nurse practitioner, from the Suffolk County House of Correction ("HOC"). Ms. Porter brought suit under 42 U.S.C. § 1983 against Sheriff Andrea Cabral, the Suffolk County Sheriff's Department ("SCSD"), and Suffolk County claiming that she was barred for communicating allegations of inmate abuse to the FBI. Sheriff Cabral insisted that she barred Ms. Porter, not for talking to the FBI, but for failing to document medical records properly.

On January 19, 2006, after a seven-day trial, a jury found in favor of Ms. Porter, awarding her $360,000 in compensatory damages and $250,000 in punitive damages. In light of the verdict, defendants have filed a motion for a new trial and remittitur and plaintiff has moved for attorneys' fees. This memorandum considers each motion in turn.

## I. MOTION FOR NEW TRIAL AND REMITTITUR

Defendants have moved for a new trial pursuant to Fed.R.Civ.P. 59, citing the following three grounds: (1) that the evidence adduced at trial was insufficient to support the jury's verdict; (2) that pretrial rulings related to the parties' *Touhy* discovery requests prevented defendants from obtaining relevant and discoverable evidence essential to their defense; and (3) that in his closing argument, plaintiff's counsel made improper appeals to emotion and sympathy and improperly exhorted the jury to send a message by its verdict.

With respect to remittitur, defendants argue that the evidence was insufficient to support $360,000 in compensatory damages; they also argue that there was insufficient evidence that Sheriff Cabral engaged in the callous and reckless conduct necessary to support an award of punitive damages, and that $250,000 in punitive damages is excessive as a matter of law. In addition, they claim that statements made by plaintiff's counsel during closing argument improperly appealed to the jury's sympathy on the issue of damages.

### A. *New Trial*

In civil cases, a district judge may grant a new trial to prevent a "manifest miscarriage of justice." *Dall v. Coffin,* 970 F.2d 964, 969 (1st Cir.1992) (internal citations omitted). In general, "motions for a new trial are directed to the trial court's discretion and this remedy is sparingly used."*Id.* Motions for a new trial should only be granted if "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GOVERNMENT EXHIBIT 7

justice."*Johnson v. Spencer Press of Maine,* Inc., 364 F.3d 368, 375 (1st Cir.2004) (internal citation omitted). A district court's discretion is limited by the parties' rights to have a jury make the ultimate fact determinations in the case. *See Ahern v. Scholz,* 85 F.3d 774, 780 (1st Cir.1996). Thus, a trial judge "cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial."*Id.* (internal citations omitted).

After careful review of the trial transcript prepared in connection with the post-trial motion practice, I find the grounds offered by defendants do not meet these demanding standards.

1. *Sufficiency of the Evidence*

***2** The jury received significant direct and circumstantial evidence indicating that Ms. Porter's communications with the FBI about allegations of inmate abuse were a substantial or motivating factor in Sheriff Cabral's decision to bar her from the HOC.

The direct evidence consisted of testimony from former Assistant United States Attorney Gerard Leone, SCSD Chief of Staff Elizabeth Keeley, and Chief of the Sheriff's Investigation Division ("SID" ), Viktor Theiss.

Mr. Leone testified that, at a June 16, 2003, meeting attended by Sheriff Cabral, members of her staff, and representatives from the FBI and U.S. Attorney's Office, Ms. Keeley listed Ms. Porter's release of sensitive and confidential information as one of the reasons for the barring. Trial Transcript (" Tr.") Day 4 at 73 (Jan. 12, 2006). Mr. Leone also recalled that at that meeting, Sheriff Cabral herself stated that Ms. Porter's communications with the FBI were a reason for her barring. *Id.* at 74.

Ms. Keeley confirmed that she told federal officials in Sheriff Cabral's presence at the June 16, 2003 meeting that one of the reasons Ms. Porter was barred was because she talked to the FBI. Tr. Day 3 at 74-75 (Jan. 11, 2006).

Mr. Theiss testified that there were only two reasons for Ms. Porter's barring mentioned at that meeting, one of which was her communications with the FBI. Tr. Day 4 at 42 (Jan. 12, 2006).[FN1] Both Ms. Keeley and Mr. Theiss testified that this reason for the barring was stated in Sheriff Cabral's presence, and Sheriff Cabral did not object.

FN1. Mr. Theiss admitted he testified falsely in a deposition in this case when he said that he did not know the reasons for Mr. Porter's barring. Tr. Day 4 at 46-47 (Jan. 12, 2006). Mr. Theiss did testify consistently with his trial testimony before a grand jury, subject to the confidentiality provisions of Fed. R.Crim. P 6(e).

Sheriff Cabral testified she did not remember what she said at that meeting regarding the reasons for barring Ms. Porter, and she admitted that she did not object to or correct Ms. Keeley's statement of the reasons for the barring. Tr. Day 6 at 93, 96 (Jan. 17, 2006).

Mr. Theiss further testified that he spoke with Ms. Keeley and Sheriff Cabral about the barring at some point after the June 16th meeting. Tr. Day 4 at 42 (Jan. 12, 2006). At this meeting, Sheriff Cabral said that she barred Ms. Porter for two reasons: speaking to the FBI without notifying the SCSD and failing to document an inmate's medical file. Tr. Day 4 at 42-43 (Jan. 12, 2006).

The record is suffused with circumstantial evidence supporting the jury's verdict. Deputy Superintendent Mary Ellen Mastrorilli testified that Mr. Theiss and Ms. Keeley authorized her to bar for Ms. Porter for speaking to the FBI. Tr. Day 2 at 128-30 (Jan. 10, 2006). Indeed, Ms. Mastrorilli was never given any other reason for the barring. *Id.* at 129-30.Consequently, when Ms. Mastrorilli told Ms. Porter that she had been barred, the reason she gave was that Ms. Porter had violated Policy S220, which prohibits employees from disclosing information about inmates to outside agencies without prior authorization or knowledge of the SCSD. *Id.* at 131-33.

There is also evidence that Sheriff Cabral was aware that Ms. Porter had informed the FBI about

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allegations of inmate abuse, and that her top aides believed this was a barrable offense. Mr. Theiss and Ms. Keeley each testified that they discussed Ms. Porter's reporting to the FBI with Sheriff Cabral. Tr. Day 4 at 57; Tr. Day 3 at 45, 47. Ms. Mastrorilli testified that Mr. Theiss agreed with her that it was " highly inappropriate" for Ms. Porter to provide information to an outside agency. Tr. Day 3 at 17. Ms. Keeley recommended to Sheriff Cabral that Ms. Porter be barred, and agreed that speaking with an outside agency was a "significant" reason for the recommendation. *Id.* at 49, 53-54.

***3** The jury also heard testimony concerning the relationship between the SCSD and the FBI which lends support to the verdict. Testimony from FBI Agent Christa Snyder suggested that representatives of SID had attempted to discover who had contacted the FBI about allegations of inmate abuse. Tr. Day 3 at 129-131. Ms. Porter testified that SID had questioned her about whether she was the one who had spoken to Agent Snyder about inmate abuse. Tr. Day 4 at 121-124. Sheriff Cabral and Mr. Theiss each testified that relations between the FBI and the SCSD had been strained. Tr. Day 6 at 88; Tr. Day 4 at 25.

The jury was presented with evidence indicating that Sheriff Cabral's purported reasons for barring Ms. Porter-failure to file a timely report regarding inmate abuse, failure to document medical records properly, and backdating medical records-were pretextual. Ms. Keeley testified that the purported backdating played no role in the barring. Tr. Day 3 at 54. Mr. Theiss concurred that backdating played no role and further stated that he never heard Sheriff Cabral mention filing a late report as a reason for the barring. Tr. Day 4 at 45-46.

Ms. Porter's direct supervisor, Health Service Administrator Donna Jurdak, testified that Ms. Porter was "probably the most qualified" nurse practitioner that she had ever worked with; that Ms. Porter was "very dedicated, hard working;" and that the inmates were "lucky to have her." Tr. Day 2 at 32. Ms. Porter's performance reviews and salary raises reflected the quality of her work. *Id.*

Ms. Jurdak testified that no one else had ever been barred for the reporting errors that Sheriff Cabral cited as reasons for Ms. Porter's barring. Tr. Day 2 at 58. Sheriff Cabral testified that two individuals were barred for falsifying records and failing to report a potentially dangerous incident, but not for filing an untimely report. Tr. Day 6 at 48-51. Of those individuals who had filed late reports, Sheriff Cabral and Mr. Theiss admitted that none had been barred. Tr. Day 6 at 69; Tr. Day 4 at 64. Moreover, Sheriff Cabral testified that Ms. Porter was never given the opportunity to explain her actions, Ms. Porter's supervisors were not contacted regarding the incident, and other measures less severe than barring were available. Tr. Day 6 at 80-81. Sheriff Cabral also stated that neither Ms. Jurdak nor Ms. Mastrorilli were disciplined, no investigation was conducted regarding a potentially systemic reporting problem, and Ms. Porter's conduct was never reported to any professional disciplinary body. Tr. Day 6 at 61-63.

Evidence was also presented from which the jury could reasonably have inferred that Ms. Porter did not violate any reporting rules. Ms. Jurdak testified that no time frame for the report was given and Ms. Mastrorilli stated that she had no problem with its timing or format. Tr. Day 2 at 44, 127. Mr. Theiss testified that the timing of the report did not negatively affect SID's investigation of allegations of inmate abuse. Tr. Day 4 at 40. Although official SCSD policy was that incident reports be filed by the end of a shift, Ms. Jurdak stated that she was not aware of the rule, and Ms. Mastrorilli explained that a technical violation of the rule was not, in her opinion, grounds for barring. Tr. Day 2 at 67; Tr. Day 3 at 31-32.

***4** Ms. Jurdak also testified that only "hands-on" medical encounters needed to be documented. Tr. Day 2 at 36-37. The jury could have credited Ms. Porter's testimony that she did not need to make an entry into a medical chart because she did not perform a medical examination on the inmate who alleged that he had been abused. Tr. Day 4 at 92, 96.

The evidence produced at trial amply supported the jury's verdict. Defendants' argument to the contrary boils down to the contention that sufficient evidence existed for the jury to find in favor of defendants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Specifically, evidence was produced from which a jury could perhaps infer that Ms. Porter violated SCSD policy and failed to perform her duties as a nurse practitioner, and on that basis in the context of Sheriff Cabral's efforts to enhance the professionalism and accountability of the SCSD, was properly barred. However, "[t]he mere fact that a contrary verdict may have been equally-or even more easily-supportable furnishes no cognizable ground for granting a new trial."*Ahern,* 85 F.3d at 780 (internal citation omitted). Consequently, I will not grant a new trial for lack of sufficiency of the evidence.

### 2. *Pretrial Rulings*

Defendants contend that the Court's pretrial rulings denying them the opportunity to depose individuals from the FBI and United States Attorney's Office (" USAO") were unduly prejudicial because they prevented defendants from adequately presenting their defense.

District courts have broad discretion to manage discovery matters.*Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.,* 333 F.3d 38, 41 (1st Cir.2003). Consequently, a discovery ruling may form the basis for overturning a jury verdict only where there is a "clear showing that the court's order was plainly wrong and resulted in substantial prejudice to the aggrieved party."*In re Pub. Offering PLE Antitrust Litig.,* 427 F.3d 49, 52 (1st Cir.2005) (internal quotation and citations omitted).

During the course of discovery in this case, defendants served several written requests and subpoenas on the FBI and the USAO pursuant to regulations promulgated by the Department of Justice, 28 C.F.R. §§ 16.21 et seq. The United States Attorney, on behalf of both the FBI and the USAO, refused to comply with the subpoenas, contending that to do so would (1) reveal confidential sources; (2) disclose investigative techniques and interfere with enforcement actions; and (3) be unduly burdensome. Defendants then moved to compel.

On September 28, 2005, I declined to hear defendants' motion to compel and indicated that a separate action under the Administrative Procedure Act ("APA") was required. Defendants filed a petition pursuant to the APA on December 9, 2005, seeking review of the decision by the United States Attorney not to comply with the subpoenas. *Cabral v. United States Dep't of Justice,* Civil Action No. 05-12468-DPW. While the USAO did not file its formal response to defendants' petition on January 20, 2006, after the trial in the instant matter was concluded, I engaged the United States Attorney's Office in ongoing discussions both immediately before and during the trial to assure that the parties received evidentiary materials from the Department of Justice appropriate for their respective trial positions. I delayed finally disposing of the APA petitions in order to assure that I could consider the issues in light of defendants' post-trial motions.[FN2] After the hearing on defendants' post-trial motions, I dismissed both APA actions.

> FN2. The plaintiff also filed an APA action, *Porter v. United States Dep't of Justice,* Civil Action No. 05-12022, seeking materials the FBI and United States Attorney's Office had declined to provide during discovery. In light of the several actions I took in connection with trial to provide certain discovery and evidence from the FBI and the United States Attorney's Office, the plaintiff did not object to dismissal of that petition. The defendants did, however, object to the dismissal of their APA action.

***5** In light of the parallel petitions filed by the parties and following an *in camera* review of *ex parte* submissions by the USAO, I allowed the parties access to information directly relevant to the narrow issue presented at trial: Agent Snyder was authorized to testify regarding her contact with Ms. Porter and representatives of the SCSD, and Mr. Leone testified as to the reasons provided by Sheriff Cabral and her staff at the June 16, 2003, meeting for barring Ms. Porter.

Defendants contend that these pretrial rulings forced them to make strategic decisions without

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

knowing all of the relevant information. Specifically, they sought to discover exactly what information Ms. Porter communicated to FBI Special Agents Christa Snyder and Maureen Robinson concerning allegations of inmate abuse. They also wished to learn what information, if any, Ms. Porter shared with the FBI regarding her interview with SID investigators Dacey and Aleman on May 28, 2003, and her barring by Sheriff Cabral. Defendants claim this information was relevant to impeach Ms. Porter and to "rebut her claims in the underlying action."

Beyond the vague assertion that their "strategic decisions" were negatively affected, defendants have not explained with any precision how the information they sought would have helped their case, or even how it is relevant. The nature-as opposed to the fact-of Ms. Porter's communications with Agents Snyder and Robinson was not at issue, and what light those communications would shed on Ms. Porter's credibility or Sheriff Cabral's actions is entirely speculative. I declined to allow defendants to engage in a fishing expedition.*Heidelberg Americas,* 333 F.3d at 41 ("A litigant may not engage in merely speculative inquiries in the guise of relevant discovery.") (quoting *Micro Motion, Inc. v. Kane Steel Co., Inc.,* 894 F.2d 1318, 1328 (Fed.Cir.1990)).

With respect to Mr. Leone, defendants claim that allowing only his testimony at trial was prejudicial because it highlighted his recollection of the events of the June 16, 2003, meeting to the exclusion of other attendees, who may have had different memories. The United States Attorney's Office, however, represented that Mr. Leone, who was no longer a Justice Department employee, was the person in the best position to testify, among other reasons, because he had notes of the meeting. I permitted the Department of Justice to explain and support its views regarding who, if anyone, should be required to testify regarding the June 16 meeting by *in camera ex parte* submissions and ultimately found these supportable, so long as Mr. Leone were produced for testimony. There is no reason to believe that the other Justice Department employees attending the meeting would have had recollections materially inconsistent with those of Mr. Leone. The individuals who had relevant information testified at trial as to that information. Defendants have demonstrated neither clear error nor prejudice in being denied the opportunity to cast their lines further into restricted FBI and USAO waters.[FN3]

> FN3. I continue to have considerable concern that in this and other cases the Department of Justice has arrogated to itself under so-called *Touhy* protocols, *see generally,*28 C.F.R. § 16.21, *et seq.,* far too expansive a view of its power to restrict discovery from the Department. Nevertheless, I am satisfied that the interactive mechanism adapted to resolve disputes in this case struck a fair balance.

### 3. *Plaintiff Counsel's Closing Argument*

***6** Defendants contend that a new trial is warranted on the grounds that plaintiff's counsel made purely emotional and inflammatory statements, misstated the evidence, and improperly exhorted the jury to deliver a message by their verdict.

Because defendants failed to object during Mr. Savage's closing argument, the standard of review is plain error. *Smith v. Kmart Corp.,* 177 F.3d 19, 25 (1st Cir.1999). Under this standard, a forfeited objection may be reviewed only if "(1) an error was committed; (2) the error was 'plain' (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice. "*Id.* at 26."Plain error is a 'rare species in civil litigation,' encompassing only those errors that reach the 'pinnacle of fault' envisioned by the standard set forth above."*Id.* (internal citation omitted).

#### a. *Emotional and Inflammatory Appeals*

The statements in plaintiff's counsel's closing on which defendants rely fall short of the plain error standard. Defendants object to the following statements by plaintiff's counsel: his statement that by returning a verdict in Ms. Porter's favor, the jury

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would be doing something "good and right," Tr. Day 7 at 29, 40-41; his request to "lift the pain and the humiliation and suffering from Sheila Porter and her family,"*id.* at 29; his repeated claim that Sheriff Cabral ruined Sheila Porter's life, *id* . at 30, 37; his display of a manufactured job description containing an excerpted portion of Ms. Porter's counseling records from treatment that she had received almost two and one-half years earlier listing her symptoms, *id.* at 40; and his claim that there was no marketplace for emotional distress. *Id.*

Although the "introduction of purely emotional elements into the jury's deliberations is clearly prohibited conduct,"*Smith,* 177 F.3d at 26, the portions of plaintiff's counsel's noted above, when read in context, were not purely emotional appeals giving rise to plain error; with one exception, they were properly directed towards the issues in the case and were within the range of proper argument.

The exception is the statement concerning the manufactured newspaper article. I interrupted plaintiff's counsel before he was able to begin this line of argument, warned him that it was improper, and ordered him to remove the "job description" from the screen. Tr. Day 7 at 40. I then instructed the jury to disregard the argument. This was sufficient to prevent the introduction of improper emotional elements into the jury's deliberations.

b. *Misstatements of Evidence*

The defendants point to two purported misstatements of evidence as grounds for a new trial, but neither comes close to reaching the " pinnacle of fault" required by the plain error standard. First, they claim that plaintiff's counsel incorrectly stated that Ms. Keeley characterized Ms. Porter's speaking to an outside agency as "integral" and "significant" to the decision to bar her. A review of the transcript, which I required the parties to order prepared after my review of their initial briefing of post-trial motions, shows that plaintiff's counsel was correct; Ms. Keeley agreed that Ms. Porter's speaking to the FBI was "integral" to the barring decision and she chose the word "significant " to describe it. Tr. Day 3 at 53-54.

*7 Defendants also object to plaintiff's counsel's statement that "five law enforcement agents were accusing [Sheriff Cabral] of barring Mrs. Porter of being an FBI informant" at the June 16, 2003, meeting. Tr. Day 7 at 32. Defendants claim that this was improper because plaintiff was precluded from introducing evidence related to the federal grand jury investigation into the circumstances surrounding Ms. Porter's barring. Defendants take plaintiff's counsel's statement out of context. Plaintiff's counsel made this statement in reference to the June 16, 2003, meeting. The five law enforcement agents to whom he referred were the federal officials who attended that meeting. Any other interpretation defies common sense. There was no misstatement.

c. *Sending a Message*

Finally, defendants argue that plaintiff's counsel's repeated appeal to the jury to send a "message" to Sheriff Cabral-and the community at large-through the award of punitive damages was improper and prejudicial.[FN4]Defendants objection, however, consists only of a conclusory statement that the argument was "clearly improper." They cite to no caselaw and merely rehash their contention that the evidence supporting the verdict was insufficient.

FN4. Plaintiff's counsel referred to sending a "message" seven times in his argument regarding punitive damages: "The law permits you-it does not require you, but it permits you-to *send a message* when someone callously disregards the civil rights of others ... She needs to be given a *message* to cut it out. But your *message* is also to others ... We don't want a world, I submit, where the Sheila Porters hesitate to help those in danger because their bosses haven't gotten the message that they can't retaliate.... But I will say to you, you can't avoid *sending a message,* because if the number is zero, that *sends a message,* too, and I believe it's a long and dangerous *message* based on the evidence in this case. "*See* Tr. Day 7 at 41-42 (emphasis added).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

While I remain of the view that invitations-particularly repetitious invitations-to a jury to "send a message" are necessarily appeals to emotional decision making, I must, after review of the authorities submitted by plaintiff, acknowledge differential treatment of such arguments in criminal and in civil cases. This differential treatment seems to have its basis in the different roles criminal and civil juries have with regard to determining punitive consequences. Because "sending a message" or " teaching the lesson" draws the criminal jury into consideration of the general and specific deterrent consequences of a verdict, arguments directed to such goals interject issues beyond the jury's fact finding responsibilities in determining guilt or innocence.FN5

FN5. In criminal cases, the invitation in a closing argument to "send a message" is consistently treated as improper. For example, a leading treatise on jury practice warns that it is "improper as a general rule to appeal to the jury to convict the criminal defendant in an effort to 'stop the war on drugs' by urging the jurors to send a message."Kevin F. O'Malley, Jay E. Grenig & William C. Lee, FEDERAL JURY PRACTICE AND INSTRUCTIONS: JURY TRIAL 684 (6th ed.2006). As the First Circuit observed in rebuking a prosecutor who told the jury " we are requesting to teach them [the defendants] the lesson. Let's make justice," such statements "serve no other purpose than 'to inflame the passions and prejudices of the jury, and to interject issues broader than the guilt or innocence of the accused.' " *United States v. Machor,* 879 F.2d 945, 955-56 (1st Cir.1989).

By contrast, some courts have referred to punitive damages as a mechanism for sending a "message" to defendants in civil cases. *Smith,* 177 F.3d at 26-27 (indicating that counsel's argument to "send a message about the unsafe conditions that caused the accident" may be proper in the context of punitive damages); *Clifton v. MBTA,* 839 N.E.2d 314, 323 (2005) ("A proper punitive damage award in this case would be a sufficient amount to send a clear message to the MBTA's management of condemnation for its reprehensible behavior ..."). Indeed, faced with an issue very similar to the instant one, the Second Circuit held that arguments to "send a message" through punitive damages are " entirely appropriate." *King v. Macri,* 993 F.2d 294, 298 (2d Cir.1993).FN6

FN6. In *King v. Macri,* 993 F.2d 294 (2d Cir.1993), court officers were found liable for civil rights violations. On appeal, they argued that the $250,000 punitive damage award was unduly enhanced by plaintiff's counsel's closing argument. Specifically, appellants objected to remarks urging the jury to award punitive damages so that defendants "will no longer think they're above the law, so that they won't be arrogant and think they can do whatever they want, so that they won't think that because they have a badge and they have a uniform they can violate people's rights."*Id.* at 298.Plaintiff's counsel also argued that an award of damages would send "that same message to others in a position to abuse their authority."*Id.* The Second Circuit found these statements unobjectionable, noting "[s]imilar remarks are made in summations in most police misconduct trials, and are entirely appropriate."*Id.* With respect, I must note I have not had such experiences in "most" police misconduct trials, perhaps because I do not countenance such remarks.

Merely describing punitive damages as a means for sending a "message" may not be improper in the context of a discussion of the civil jury's role in calibrating a sanction to deter. *Cf. McMillan v. MSPCA,* 140 F.3d 288, 307 (1st Cir.1998) (approving of jury instructions describing punitive damages as "intended to punish the defendants as a warning, both to them and other like-minded individuals, that society will not tolerate grievous discriminatory behavior"). Plaintiff's counsel's *repeated* references here to sending a "message," however, bring this case closer to the boundary of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the emotional and inflammatory, despite the low-key manner in which they were delivered.

***8** In this case, believing that a "send the message" argument is at best bad practice, even in civil cases involving the potential for punitive damages and chastened by reflections on my failure to provide a more direct curative instruction in a prior police misconduct case in which I had viewed counsel's argument as improper,[FN7] I delivered the following curative instruction to the jury *sua sponte:*

> FN7.*See Bolton v. Taylor,* 367 F.3d 5 (1st Cir.2004).*Bolton* involved an egregious closing argument by plaintiff's counsel. Defense counsel there also did not make contemporaneous objections to the "send a message" themes contained in that argument. I choose, *sua sponte,* (I now think too obliquely and cerebrally) to attempt to take any sting out by a final instruction equating the sending of a message with the concept of specific deterrence. *Bolton v. Taylor,* 99-CA-12202, Jury Trial Day 4 (Aug. 16, 2001), at 23 (containing the following jury instruction: "under the Federal Civil Rights laws, there are punitive damages because the law has made a determination that an individual citizen bringing an individual civil rights claim has a right to have a jury decide whether or not by the award of some money, a message can be sent. That message is a specific deterrent to the individuals involved ...").

You'll recall the call to deliver a message. That's not what we're talking about here. What you're here to do is make a judgment about the appropriate, if any, sanction to be imposed above compensatory damages ... You must be disciplined. This is not an opportunity to just go off on your own.

Tr. Day 7 at 68-70. I assume that the jury followed these instructions and disregarded any impropriety in plaintiff's counsel's appeals to send a "message." *See Refuse & Envtl. Sys ., Inc., v. Indus. Serv. of America, Inc.,* 932 F.2d 37, 40 (1st Cir.1991) ("A basic premise of our jury system is that the jury follows the court's instructions. We must assume that juries follow instructions.") (internal quotations and citations omitted). Defendants argue that this *sua sponte* instruction-concerning a matter as to which they were not sufficiently agitated even to request instruction at trial-was not enough, but they offer no support for that contention beyond the assertion that they presented evidence sufficient for a jury to find in favor of Sheriff Cabral.

In sum, plaintiff's counsel's summation is not grounds for a new trial. It was proper argument in the view of some judges, myself excepted, and to the extent that it strayed across identifiable boundaries into the realm of impropriety, the curative instruction I gave to the jury prevented any miscarriage of justice.

### B. *Remittitur*

Defendants contend that the jury award of $360,000 in compensatory damages and $250,000 in punitive damages is unsupported by the record. They request a new trial on the issue of damages, or in the alternative, they move for remittitur of the damage awards.

In reviewing an award of damages, a district court " is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.' " *E. Mountain Platform Tennis v. Sherwin-Williams Co., Inc.,* 40 F.3d 492, 502 (1st Cir.1994) (quoting *Kolb v. Goldring, Inc.,* 694 F.2d 869, 872 (1st Cir.1982)). "A party seeking remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Marcano Rivera v. Turabo Med. Center Partnership,* 415 F.3d 162, 173 (1st Cir.2005) (internal citation omitted).

#### 1. *Compensatory Damages*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The jury compensated Ms. Porter an undivided $360,000 for both economic and non-economic compensatory damages. Far from shocking the conscience, this award falls well within the range rationally supported by the evidence.

***9** Ms. Porter testified that she lost approximately $79,000 in income since she was terminated. Tr. Day 4 at 137. She stated that she lost between $27,000 and $30,000 over the last year, and she expected to work for another 10 years.*Id.* at 98-99.This evidence suggests economic damages alone, but without present value calculations, of up to $379,000. Defendants contend that there was no guarantee that Ms. Porter would have held her job with CMS for ten years, and observe that she voluntarily chose to leave a full-time position in Essex County for a lower-paying per diem position. These arguments ignore evidence presented at trial showing that Ms. Porter was a committed professional and a top performing employee, Tr. Day 4 at 97, Day 2 at 32, but that the job in Essex County was unattractive because it required a taxing 62-mile commute, Tr. Day 4 at 134-35.

With respect to pain and suffering, Ms. Porter, her husband, and her daughter testified as to the emotional impact that the barring had on Ms. Porter. That testimony showed that Ms. Porter had difficulty sleeping, cleaned compulsively, gained weight, and experienced fits of crying. Tr. Day 4 at 7-9, 89, 139. Records from eight counseling sessions that Ms. Porter had with a licensed clinical social worker in 2003 were also in evidence. There was no effort at cultivating undue sympathy in plaintiff's evidence. The plaintiff's presentation was presented in a low key manner and showed a diligent person quietly attempting to come to grips with a devastating insult to her sense of self-worth and larger professional and civic goals and purpose. Defendants argue that Ms. Porter's testimony and that of her family was uncorroborated and, in any event, showed that Ms. Porter's emotional condition had improved significantly over time. Ultimately, however, while the defendants may not find the evidence persuasive, it was sufficient to support the award of non-economic damages made by the jury here.

Because the compensatory damage award was not itemized, it is not clear what proportions of the total award represent economic and non-economic damages respectively. Nevertheless, the compensation award was less than the maximum economic damages supported by the evidence.

### 2. *Punitive Damages*

Section 1983 authorizes the award of punitive damages when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."*Casillas-Diaz v. Palau,* 463 F.3d 77, 84 (1st Cir.2006) (internal citations omitted). Thus, a plaintiff seeking punitive damages "must demonstrate that the defendant intentionally, or with conscious indifference, violated the plaintiff's federally protected civil rights."*Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70, 84 (1st Cir.2001).

Punitive damages are reviewed for "fundamental fairness." That review is based on the principle that a person must "receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."*Id.* at 81 (*quoting BMW of N. Am. Inc. v. Gore,* 517 U.S. 559, 574 (1996)). In determining whether an award of punitive damages may stand, courts rely on the following three guideposts: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the compensatory and punitive damages; and (3) the difference between the punitive damage award and the civil penalties imposed for comparable conduct.*Id.* In the final analysis, "a punitive damage award will stand unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct."*Id.* (internal citation omitted). *See generally, Philip Morris USA v. Williams,* No. 05-1256 Slip op. at 4-5 (U.S. Feb. 20, 2009) (summarizing constitutional limitations on punitive damages).

***10** The jury could reasonably infer that Sheriff Cabral barred Ms. Porter with, at a minimum,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conscious indifference to her First Amendment rights. Sheriff Cabral, a former civil rights lawyer herself, acknowledged that she knew that speaking to a FBI agents was speech protected by the First Amendment. Yet, as discussed above, sufficient evidence existed to find that Sheriff Cabral transgressed those constitutionally protected rights by effectively, if indirectly, sanctioning Ms. Porter for speaking to FBI agents.

The first *Gore* factor-the reprehensibility of the defendant's conduct-is the "most telling indicium of the reasonableness *vel non* of a punitive damage award."*Zimmerman,* 262 F.3d at 82. In order to justify a substantial award, the defendant's conduct must reflect a "high level of culpability." *Id.* Defendants insist that Sheriff Cabral's behavior did not rise to the level of egregiousness or outrageousness necessary to justify a $250,000 punitive damages award.[FN8]And I agree that the evidence, viewed in the light most favorable to defendants, would also support a much lower-or even no-punitive award.

FN8. Defendants cite to a number of cases to provide context for the punitive damage award in this case. Although these cases show lower punitive awards for arguably more reprehensible conduct than that for which Sheriff Cabral was responsible, they are of little help in locating the upper bound of reasonableness in the particular facts of this case. *See Whitfield v. MelendezRivera,* 431 F.3d 1, 18 (1st Cir.2005)(punitive damages of $15,000 against individual police officers who shot plaintiff twice as he retreated not excessive); *Fishman v. Clancy,* 763 F.2d 485, 489 (1st Cir.1985)(punitive damage awards of $39,000 against superintendent and $26,000 against school principal not excessive where the evidence established that defendants repeatedly retaliated against plaintiff for exercising her First Amendment rights); *Clifton v. MBTA,* 445 Mass. 611, 623-24 (2005) (punitive damages of $5 million dollars against employer (public agency) for outrageous and shocking discrimination in the workplace remitted to $500,000; new trial ordered when plaintiff refused to accept remittitur); *McMillan v. MSPCA,* 140 F.3d 288, 306 (1st Cir.1998) (punitive damage award of $135,662.50 against MSPCA and $171,250 against individual defendant based upon finding of intentional misconduct were grossly excessive); *Acosta-Sepulveda v. Hernandez-Purcell,* 889 F.2d 9, 13 (1st Cir.1989) (punitive damages of $10,000 against individual employer for First Amendment violation not excessive where conduct constituted blatant disregard for free speech); *Rowlett v. Anheuser-Busch, Inc.,* 832 F.2d 194, 207-208 (1st Cir.1987) (punitive damage award of $3 million dollars against defendant corporation deemed excessive and reduced to $300,000); *Williams v. Brimeyer,* 116 F.3d 351, 355 (8th Cir.1997) (punitive damages of $500 against prison officials for violating inmate's First Amendment rights not excessive).

However, the jury, in the exercise of its prerogatives, clearly did not view the facts in the light most favorable to Sheriff Cabral, and as discussed above, the evidence amply supported the jury's verdict in Ms. Porter's favor. The jury rationally could have found that Sheriff Cabral caused Ms. Porter to be deprived of a job she found especially satisfying for speaking to the FBI, knowing full well that Ms. Porter's speech was constitutionally protected. Such conduct is certainly reprehensible.

A separate question here is whether the $250,000 punitive damage award meets the requirements of fundamental fairness. I conclude that it does. The remaining *Gore* guideposts for assessing punitive damages clearly point toward leaving the award intact. The case law indicates that a 4:1 ratio of compensatoryto-punitive damages does not "cross the line into the area of constitutional impropriety." *Zimmerman,* 262 F.3d at 82 (citing *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 24 (1991). Accordingly, an award with a ratio of less than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

one-0.69:1-presents no cause for concern on its face.

The essentially parallel scheme for imposing civil penalties for the misconduct shown here, the Massachusetts Whistleblower statute, authorizes up to three times lost wages, benefits, and other remuneration and interest thereon to employees who are subject to retaliation for providing information to law enforcement. *See*Mass. Gen. Laws ch. 149, § 185(d)(4).[FN9] In this case, where evidence was introduced showing that Ms. Porter lost $379,000 in wages, excluding interest, a $250,000 award is well within reason in light of civil penalties for similar misconduct.

FN9. I found the Whistleblower statute not directly applicable in this case essentially because the defendant had outsourced Ms. Porter's duties through a private contractor. Nevertheless, statutory Whistleblower penalties, tethered as they are to the harm to an identifiable plaintiff, prove a convenient way to measure whether the punitive damages are directed as required to the harm endured by the plaintiff rather than by strangers to the litigation. *See generally Philip Morris USA v. Williams,* No. 05-1256 (U.S. Feb 20, 2007).

Accordingly, I find that while the $250,000 award may approach the "outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct,"*Zimmerman,* 262 F.3d at 81, the punitive damages set by the jury here do not exceed that boundary.

### 3. *Conclusion*

***11** After careful review of the record, including the transcript prepared in connection with the post-trial motions, I conclude that neither a new trial nor remittitur are appropriate in this case.

## II. MOTION FOR ATTORNEYS' FEES

Courts are authorized by statute, 42 U.S.C. § 1988, to award prevailing plaintiffs in civil rights cases, such as this one, "reasonable" attorney's fees and costs. Ms. Porter submitted a motion for attorneys' fees claiming $287,000 for legal services, $24,304.94 in costs and $6,500 for electronic litigation support at trial, for a total fee of $318,781.94.[FN10]Defendants challenge the requested amounts on the grounds that they are (1) unnecessary, unproductive, duplicative and excessive; (2) spent on unsuccessful motions, claims or contentions; (3) spent on non-core and clerical tasks; and (4) not properly documented. Defendants also contend that the hourly rates sought by counsel are excessive.

FN10. In a supplemental filing earlier this month, Ms. Porter, asserting that in light of recent authority in Massachusetts state and federal courts she "unduly discounted the hourly rate at which her attorneys should be compensated" requests a 5% increase in any fee award. As will appear, I have determined the appropriate fees without recourse to such escalators.

The First Circuit applies the "lodestar" method to determine a reasonable fee award. *Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F.3d 331, 337 (1st Cir.1997). Under this approach, the judge calculates "the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)" to arrive at the lodetar figure. *Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 295-96 (1st Cir.2001).

In general, attorneys' contemporaneous billing records constitute the starting point for determining a fee award, "but the court's discretion is by no means shackled by those records."*Id.* at 295-96. Rather, "it is the court's prerogative (indeed, its duty) to winnow out excessive hours, time spent tilting at windmills, and the like."*Id.* at 296."By the same token, the court may take guidance from, but is not bound by, an attorney's standard billing rate." *Id.* Consequently, in considering a fee application,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court may "segregate time spent on certain unsuccessful claims, eliminate excessive or unproductive hours, and assign more realistic rates to time spent."*Coutin,* 124 F.3d at 337.

Once the initial lodestar figure has been calculated, " [t]here remain other considerations that may lead the district court to adjust the fee upward or downward." *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983). One important factor is the "results obtained," which prohibits fee awards for hours expended on unrelated, unsuccessful claims. *Id.* Other factors include:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney(s) due to acceptance of the case; (5) the customary fee; (6) the nature of the fee (fixed or contingent); (7) the time limitations imposed by the client or the circumstances; ... (9) the experience, reputation, and ability of the attorney(s); (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) the size of awards in similar cases.
***12** *Coutin,* 124 F.3d at 337 n. 3 citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-719 (5th Cir.1974). However, it should be noted that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley,* 461 U.S. at 434 n. 9.

Using the lodestar approach described above, I consider, with sensitivity to the other important considerations caselaw has identified, the appropriate fee award with respect to legal services, costs, and electronic support in turn.

**A. *Legal Services***

Ms. Porter requests a base figure of $287,000 for the legal services performed by lead counsel Joseph F. Savage, Jr.; associates Jennifer Goddard, David S. Schumacher, Anita B. Bapooji, and James. R. Sweet; and paralegal Andrea N. Boivin.[FN11]

FN11. Compensation is not sought for five other lawyers and two paralegals who also worked on the case for the plaintiff.

**1. *Hourly Rates***

Ms. Porter argues that her attorneys should be compensated at hourly rates of $380 for Mr. Savage, $240 for Mr. Schumacher and other associates, and $110 for Ms. Boivin.[FN12] Defendants contend that these rates are too high. They suggest $225, $150, $125, $50 per hour for Mr. Savage, Ms. Goddard, Mr. Schumacher and other associates, and Ms. Boivin, respectively.[FN13]

FN12. I note that the standard large firm billing rates for these individuals during their periods of most intense activity were significantly higher than what they claim here.

FN13. Defendants contend that the prevailing practice in the First Circuit is to adjust the lodestar calculation by distinguishing between "core" legal work (work requiring the skill and expertise of an attorney) and "non-core" work (less demanding tasks such as telephone calls, scheduling, letter-writing that could be performed by non-lawyers) and billing non-core work at two-thirds the reasonable hourly rate charged for the core work of that attorney.
My colleagues in the District of Massachusetts appear to have a range of views on this issue. *Compare Bogan v. City of Boston,* 2006 WL 1283569 *7 (D.Mass.2006) (Bowler, M.J.); *Parker v. Town of Swansea,* 310 F.Supp.2d 376, 391 (D.Mass.2004) (Dein, M.J.); *La Plante v. Pepe,* 307 F.Supp.2d 219, 225 (D.Mass.2004) (Gertner, J .); *Alfonso v. Aufiero,* 66 F.Supp.2d 183, 196 (D.Mass.1999) (Saris, J.); *McLaughlin by McLaughlin v. Boston School Committee,* 976 F.Supp. 53 (D.Mass.1997) (Garrity, J.); and *Brewster v. Dukakis,* 3 F.3d 488, 492 n. 4 (1st Cir.1993) with *Change The*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> *Climate, Inc. v. MBTA,* 2005 WL 3735100, *3 (D. Mass. June 8, 2005) (Keeton, J.) (rejecting core/non-core distinction); with *Mogilevsky v. Bally Total Fitness Corporation,* 311 F.Supp.2d 212, 217-218 (D.Mass.2004) (Young, C.J.) (rejecting core/non-core distinction, but recognizing that a court must not permit an attorney to recover his standard hourly rate for work appropriate for a less experienced lawyer or a paralegal or secretary); and *Systems Management, Inc. v. Loiselle,* 154 F.Supp.2d 195, 209 (D.Mass.2001) (Young, C.J.).
> As a matter of practice, in the absence of further guidance from the Court of Appeals, I will apply a single rate, which takes the variety of lawyers' tasks into account through a single, blended hourly rate that more closely mirrors the usual billing practices of law firms without introducing artificial distinctions among the various activities attorneys perform. As a matter of fact, I do not find that time was expended inefficiently for the compensable legal services afforded the plaintiff.

It is well established that attorney's fees are calculated "according to the prevailing market rates in the relevant community ."*Blum v. Stenson,* 465 U.S. 886, 895 (1984). This means that the rates must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."*Id.* at 896 n. 11.Plaintiff bears the burden of justifying the reasonableness of the requested rates by producing evidence of the prevailing market rate. *Id.* In this case, the starting point is the prevailing hourly rate in Boston for civil rights practitioners of comparable skill, experience, and reputation, taking into account the attorney's qualifications, experience, and specialized competence. *See Bogan v. City of Boston,* 432 F.Supp.2d 222, 229 (D.Mass.2006) (Bowler, M.J.); *Parker v. Town of Swansea,* 310 F.Supp.2d 376, 388 (D.Mass.2004) (Dein, M.J.).

Beginning with Mr. Savage, the evidence submitted by Ms. Porter together with recent cases show that the appropriate rate for lead civil rights attorneys in the Boston area [FN14] is between $200 and $350 per hour. *See* Decl. of Harvey A. Schwartz ¶ 4, Plaintiff's Ex. H (one of the more experienced civil rights attorneys in Massachusetts, reports charging a present hourly rate of $350); *Dixon v. Int'l Brotherhood of Police Officers,* 434 F.Supp.2d 73, 85-86 (D.Mass.2006) (Young, J.) ($250 per hour for lead counsel with ten years relevant experience); *Bogan,* 432 F.Supp.2d at 230 ($300 per hour for a partner with over 35 years of legal experience and $200 for less experienced lead counsel); *McDonough v. City of Quincy,* 353 F.Supp.2d 179, 187-188 (D.Mass.2005) (Young, C.J.) ($200 per hour for lead attorney with eleven years relevant experience); *LaPlante v. Pepe,* 307 F.Supp.2d 219, 224-25 (D.Mass.2004) (Gertner, J.) ($300 per hour for lead counsel and $275 for senior litigation associate, both of whose "inexperience in civil rights cases was more than matched by their overall trial expertise").

> FN14. In the absence of some showing of special expertise justifying counsel (and fee standards) outside Boston, *cf. Sarsfield v. Marlborough* No. 03-10319-RWZ (D.Mass. Jan. 26, 2007) (pioneer in DNA analysis and specialist in wrongful conviction litigation both from New York), a showing not made here, I decline to consider prevailing rates outside Boston. Because civil rights litigation is a sufficiently discrete practice area to have a relevant market for attorneys, I will use the customary rates for attorneys practicing law in this area as the benchmark. This is a relevant market distinctive from general employment law, for example. *Cf. Pelegrino v. NAGE,* No. 03-0438 (Mass. Superior Court, Norfolk County, November 20, 2006).

***13** Mr. Savage has had extensive experience in criminal and civil litigation as a seasoned United States Department of Justice trial attorney and partner in private practice, first, at Testa, Hurwitz & Thibeault, LLP, ("Testa Hurwitz") and, more recently at Goodwin Procter, LLP ("Goodwin

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Procter"). Prior to this litigation, he had never represented a plaintiff in a First Amendment civil rights case. But his criminal law experience gave comparable background and training, albeit not specifically in the First Amendment area. Given Mr. Savage's limited experience in civil rights litigation, but rather lengthy and meaningful experience in civil and criminal litigation, I find that an hourly rate of $325, slightly less than that of the most experienced civil rights attorneys like Mr. Schwartz, to be appropriate.

With respect to assisting counsel, I observe that in the recent past the range of reasonable rates for civil rights work appears to be $100-$175 per hour. *See Dixon,* 434 F.Supp.2d at 86-87 ($175 for assistant counsel with five years of legal experience; $150 for associates who spent little time on the case and whose experience was not well documented); *McDonough,* 353 F.Supp.2d at 188 ($150 per hour for assistant counsel with nine years of experience who performed less vigorous work on the case); and $100 for a junior associate); *LaPlante,* 307 F.Supp.2d at 224-25 ($150 and $120 for junior associates). Nevertheless, Mr. Savage's colleagues here were particularly capable, if relatively inexperienced in civil rights cases, and higher levels of compensation appear appropriate for them.

Ms. Goddard was the associate who managed the case while it was at Testa Hurwitz. It appears that she had about ten years of employment law experience at Testa Hurwitz and had since been elected to the partnership at that firm after her work on this case. There is no record of her civil rights experience, and her participation in this case was primarily in drafting demand letters, pleadings, and plaintiff's Opposition to Defendants' Motion to Dismiss. Given the similarities to traditional employment law, however, I find an hourly fee of $200 to be reasonable for her services in this case.

Mr. Schumacher was responsible for the day to day handling of this case at Goodwin Procter, and he was second chair at the trial. He has six years of experience working on a variety of complex civil and criminal matters. He also has no civil rights experience. His work nevertheless was of very high quality. I will award fees at the rate of $225 to reflect his general litigation experience and extensive and productive work on this case, balanced by his lack of prior relevant civil rights experience.

Ms. Bapooji worked on this case when Mr. Schumacher was unavailable. She has been in practice since 1997, concentrating on general corporate and commercial litigation. She has no significant civil rights experience, and her role in this case appears to have been confined to administrative and discovery matters. A rate of $200 per hour is reasonable for her work on this case.

***14** Mr. Sweet has worked at Goodwin Procter since 2003 specializing in complex civil litigation. He also has no demonstrated civil rights experience. Given his general level of experience, $175 per hour is a reasonable rate for his work.

Turning to Ms. Boivin, I observe caselaw indicates that a reasonable rate for paralegal work is generally $65 per hour. *See Dixon,* 434 F.Supp.2d at 87-88 ($60 for paralegals and law students); *Bogan,* 432 F.Supp.2d at 230 ($65 per hour for support staff); *McDonough,* 353 F.Supp.2d at 188-89 ($50 for full-time legal assistant). But Ms. Boivin has a law degree and she was responsible for managing exhibits, documents, depositions, and electronic databases in a complex case for a demanding trial. Her education, ten years of experience, and responsibility in this case justify an award of $85 an hour.

### 2. *Number of Hours*

Ms. Porter initially requested attorney's fees for 1020.30 hours of work on this case.[FN15] This number represents a fraction of the time actually spent by Testa Hurwitz and Goodwin Procter attorneys and staff on this case; plaintiff's attorneys have removed time charges to reflect only the most critical activities. Ms. Porter also contends that this case was complicated by the presence of the federal government and the "repeated stonewalling" of the defendants. Defendants characterize this case as a straightforward civil rights action that plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

chose to overlitigate. They contend that the number of hours should be reduced further because the complaint was overpled, staffing and allocation decisions were inefficient and duplicative, and work on unsuccessful claims and non-core legal activities was included.

FN15. In a reply filing, the hours initially claimed for Mr. Schumacher were modestly adjusted downward by plaintiff. I calculate hours according to this adjusted figure.

Attorneys should, of course, exercise billing judgment in applying for fees. Hours that were " excessive, redundant or otherwise unnecessary" will be excluded from the fee calculation. *Hensley,* 461 U.S. at 434. It appears that in the submissions now before me Ms. Porter's attorneys have exercised discretion,[FN16] and as detailed below, I accept their requested hours with only slight modifications.

FN16. I note that at the outset of the case, plaintiff's counsel asserted an extensive collection of claims almost as if the exercise of pleading was a law school exam designed to identify how many different causes of action could be teased from a set of facts. Motion practice and pretrial cases management served to prune and focus plaintiff's claims. I share Judge Brady's "experience [that] it is normal for plaintiff's attorneys to overplead at the outset of the case, with the normal litigation process sifting and winnowing out the unmerited claims until the case has become crystallized for the jury." *Pellegrino v. NAGE,* Slip op. at 4.

Beginning with Mr. Savage, defendants request that the court reduce his claimed 344.60 hours by 76.30 hours to eliminate time spent prior to filing the complaint, time spent on unsuccessful claims and evidence not utilized or ruled inadmissible, duplicative time, and insufficiently documented time periods. I find the work conducted prior to the filing of the complaint in September 2004 was directly related to the pursuit of the civil rights and other related claims, so it is recoverable. *Compare Bogan,* 432 F.Supp.2d. at 231 (excluding time spent prior to the filing of the initial complaint on issues unrelated to the civil rights claim). I will not deduct on grounds it was not unproductive, for time spent working on the admissibility of evidence that was ultimately not used at trial; that constituted legitimate trial preparation with value apart from the immediate task at hand. Similarly, hours spent reviewing the pleadings, sending emails regarding staff changes at the SCSD, and reviewing materials and attending a hearing on Defendants' Motion to Stay will not be deducted. They were necessary to insure full preparation.

***15** Generally, time spent on unsuccessful claims is not recoverable unless they involve a "common core of facts" or "related legal theories." *Gay Officers Action League,* 247 F.3d at 295 n. 5 ( *quoting Aubin v. Fudala,* 786 F.2d 287 (1st Cir.1986)). In addition to her successful § 1983 and tortious interference with advantageous relations claims, plaintiff's complaint contained a number of unsuccessful counts alleging violation of the Massachusetts Whistleblower statute, the Massachusetts Civil Rights Act, breach of contract, defamation, and intentional infliction of emotional distress. With the possible exception of the defamation count, the claims all arose from a common set of facts. Because Ms. Porter's attorneys appear to have omitted from the bill charges that stem solely from the pursuit of the defamation claim, I will not reduce the number of hours further on the grounds that other of the related claims ended up on the litigation's cutting room floor or were otherwise unsuccessful.

Finally, defendants complain that the Mr. Savage's records are not sufficiently detailed. For example, during the trial, while he billed over ten hours per day on most days, and for three of those days, he failed to specify the tasks performed after trial had ended. I agree that greater specificity might be a better practice. But my observation of his work and familiarity with the demands of trial provide an adequate basis for me not to reduce the hours claimed, which seem to me altogether reasonable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

With respect to the 23.40 hours requested for Ms. Goddard, defendants argue that four hours should be deducted for work spent prior to the filing of the complaint. As with Mr. Savage, the time Ms. Goddard spent prior to the filing of the complaint was directly related to the § 1983 claim, and is, therefore, recoverable. I find the hours claimed for Ms. Goddard are reasonable.

Defendants contend that Mr. Schumacher's requested 512.70 hours should be reduced because they involve time spent on unsuccessful claims, excessive or duplicative work, and insufficiently documented records. I declined to reduce Mr. Savage's hours for those reasons, and the same reasoning and results apply to Mr. Schumacher's hours as adjusted.

Plaintiff claims a total of 39.80 hours for Ms. Bapooji. Defendants argue that none of Ms. Bapooji's time is compensable because her assistance was unnecessary and the work done was unproductive and in support of unsuccessful theories of liability. But Ms. Bapooji's work primarily involved discovery and administrative tasks directly related to the successful claims in this case. Compensation for those hours is reasonable.

Ms. Porter requests compensation for 55.10 hours of work by Mr. Sweet. Defendants argue that this number should be reduced by 7.7 hours to reflect work on unsuccessful claims, failed motions in limine, and duplication of Mr. Schumacher's work reviewing and preparing exhibits for trial. I find the requested hours for Mr. Sweet to be reasonable; his work on unsuccessful but related claims sufficiently overlaps with the successful claims and consequently is compensable. I do not find any disabling duplication.

***16** With respect to Ms. Boivin, defendants contend that the 44.70 hours claimed are excessive given the primarily clerical nature of the tasks performed. Ms. Boivin's work consisted of making copies, editing, categorizing, and indexing exhibit lists, copying exhibits, supervising the transportation of materials from court to the firm and assisting with electronic document issues at trial. I find that the hours claimed for these tasks on January 7 and 8, 2006 to be a bit excessive, but the other entries to be reasonable. I will deduct two hours from her total requested time for January 7 and 8, 2006.

Finally, defendants contend that the 45.25 total hours spent by Mr. Savage, Mr. Schumacher, and Mr. Sweet reviewing, researching, and drafting Ms. Porter's Opposition to Defendants' Motion for a New Trial and Remittitur to be excessive. Although the motion involved no truly complex or novel issues of law, it was fact intensive, required full transcript review and the time billed and the staffing of two associates on this matter was not unreasonable. Mr. Savage billed only 2.9 hours, representing time spent on this fee petition and the motion for a new trial. This is quite reasonable.

The following chart summarizes the pay rate and compensable for each legal service provider:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | Pay rate | Hours | Compen sation |
|---|---|---|---|
| Mr. Savage | $325 | 344.6 | $111, 995.00 |
| Ms. Goddard | $200 | 23.4 | $4,680.00 |
| Mr. Schum acher | $225 | 512.7 | $115, 357.50 |
| Ms. Bapooji | $200 | 39.8 | $7,960.00 |
| Mr. Sweet | $175 | 55.1 | $9,642.50 |
| Ms. Boivin | $85 | 42.7 | $3,629.50 |
| Total | | | $253, 264.50 |

### B. *Costs*

The parties exchange conclusory contentions with respect to costs. Ms. Porter asks for costs in the amount of $24,304.94. Defendants argue that $14,664.39 of that figure, identified generally as " fees and disbursements for printing," is insufficiently documented. Defendants also claim that the $8,464.55 spent on transcripts involves unsuccessful claims.

While I view the transcript costs as necessary to this litigation, I have no reasonable basis other than contemporaneous charge sheets for daily totals to evaluate the necessity of the reproduction copying charges. Without some specification of the per page charge and the purpose of the reproduction, I can only say that some reproduction for some purpose took place on those days. I cannot fairly evaluate the necessity and value of those costs. Recognizing that significant reproduction costs would be justified but without some basis to evaluate how much because plaintiff's counsel-although on notice regarding the need to specify-did not do so adequately, I will award half the reproduction costs claimed ($7,332.19). Thus the total costs awarded are $16,972.74.

### C. *Electronic Litigation Support*

Plaintiff requests $6,500 for the services of James Berriman, an attorney who prepared and arranged presentation of the evidence electronically at trial. The bill represents 26 claimed hours of work at a rate of $250 per hour.[FN17] I do not reduce his hours, because I find that they are not, as defendants contend, duplicative of work done by Ms. Boivin. In fact, he brought to the trial additional skills with the effective and efficient electronic presentation of evidence from which the court, the jury and the defendants, in addition to Ms. Porter, all benefitted. I will, however, apply a reduced hourly rate of $200 for Mr. Berriman's services, paralleling the discounting I have imposed on the rates of attorneys other than Mr. Savage, the lead trial counsel, and Mr. Schumacher, the second chair.

FN17. Mr. Berriman, who is Senior Counsel and Executive Manager of Litigation Technology at Goodwin Procter was billed at standard customary rates of $450 per hour during this time period.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### D. *Conclusion*

***17** The lodestar based calculation for fees and costs is as follows:

| | |
|---|---|
| Legal services | $253, 264.50 |
| Costs | $16,972.74 |
| Electronic Litigation Support | $5,200.00 |
| Total | $275, 437.24 |

Although it is within my discretion to adjust the lodestar figure upward or downward to account for unusual circumstances in a case, I do not find that appropriate here because all relevant considerations are reflected in the basic calculations.

## III. CONCLUSION

For the reasons set forth more fully above, Defendants' Motion for a New Trial and Remittitur is DENIED, and Plaintiff's Motion for Attorney's Fees and costs is GRANTED in the amount of $275,437.24. Interest on this award shall run from this day.[FN18]

FN18. In this connection, I grant the Plaintiff's Motion for Interest on Attorneys' Fees, to which no objection was understandably interposed, from the date of the allowance of fees and costs.

D.Mass.,2007.
Porter v. Cabral
Not Reported in F.Supp.2d, 2007 WL 602605 (D.Mass.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.